NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0388n.06

No. 15-6067

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| JOHN W. BEAUCHAMP and JESSICA L. KLINGENBERG, | ) ) ) | |
| Plaintiffs-Appellants, | ) ) | **FILED** |
| v. | ) ) | Jul 11, 2016 |
| FEDERAL HOME LOAN MORTGAGE CORPORATION, | ) ) ) | DEBORAH S. HUNT, Clerk |
| Defendant-Appellee, | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY |
| REGIONAL REALTY, LLC AND EIBECK REALTY GROUP, LLC, | ) ) ) | |
| Defendants. | ) | |

Before: COOK and KETHLEDGE, Circuit Judges; SARGUS, District Judge.[*]

KETHLEDGE, Circuit Judge. Freddie Mac hired Terry Eibeck to prepare a foreclosed condominium and detached garage for resale. But Eibeck cleaned out the wrong garage, and thus disposed of personal property that belonged to John Beauchamp and Jessica Klingenberg, who have since married. The Beauchamps sued Freddie Mac and Eibeck, alleging that Freddie Mac was vicariously liable for Eibeck's negligence and directly liable for its own negligent supervision of Eibeck. The district court granted summary judgment to Freddie Mac and dismissed the Beauchamps' claims against Eibeck for lack of jurisdiction. We reverse in part.

---

[*] The Honorable Edmund A. Sargus, Jr., Chief Judge of the United States District Court for the Southern District of Ohio, sitting by designation.

I.

In January 2012, Freddie Mac hired Terry Eibeck to manage and list various foreclosed properties in Northern Kentucky. On occasion, that job required Eibeck to dispose of any personal possessions left behind. As part of its contract with Eibeck, Freddie Mac prescribed detailed procedures for how Eibeck should conduct these so-called trash-outs. Those procedures required Eibeck to photograph the abandoned possessions, create an inventory of the possessions, and estimate their approximate value. If the possessions were worth more than $300 or included items of inherent personal value, like photo albums or diplomas, Eibeck must halt the trash-out and call a supervisor at Freddie Mac.

In August 2012, Freddie Mac asked Eibeck to manage and list a condominium in Highland Heights, Kentucky. When Eibeck found personal possessions inside the detached garage, he took a few pictures, compiled a two-page inventory, and estimated the value of everything in the garage as $175.00. He then had the possessions removed and destroyed.

Three months later, when Jessica Beauchamp opened her garage door, she expected to find a truckload of personal possessions—financial records, yearbooks, loose pictures, photo albums, a collage of pictures from her high school graduation, and two green sea bags and a mail crate from John Beauchamp's time in the U.S. Marine Corps. The sea bags had contained John's desert and garrison uniforms, the combat boots he wore in Iraq, various other pieces of military gear and clothing, and all of John's original medals, ribbons, and shooting badges. The mail crate contained an irreplaceable picture of John's platoon on the day he graduated from boot camp aboard Marine Corps Recruit Depot Paris Island, and a graduation certificate from the Army's Military Police School at Fort Leonard Wood, Missouri. What Jessica found, however, was an empty garage.

Jessica filed a police report and then called the leasing office for the condominium complex where she and John lived in Unit 9 of Building 19. The employee explained that Unit 9 of the next building over—Building 20—had been foreclosed on a few weeks earlier and that Terry Eibeck had handled the foreclosure. By that time, however, the Beauchamps' property had long since been destroyed.

The Beauchamps sued Freddie Mac and Eibeck in federal district court, which has original jurisdiction over all civil actions filed against Freddie Mac. *See* 12 U.S.C. §1452(f). The parties consented to transfer the case to a magistrate judge for disposition pursuant to 28 U.S.C. § 636(c), and in October 2014, Freddie Mac filed a motion to dismiss. The Beauchamps—who were then law students and are now attorneys—represented themselves pro se until they retained counsel in March 2015, shortly after the district court denied Freddie Mac's motion to dismiss.

Discovery revealed that Eibeck had complied with some of Freddie Mac's procedures better than others. Nowhere in the inventory, for example, did Eibeck list John's sea bags or any other military items—even though John's boots are clearly visible in Eibeck's picture. Nor had Eibeck's $175.00 estimate come close to the property's actual value. (A pair of Marine Corps-approved boots alone can exceed the $300 threshold for halting a trash-out. And Marine uniforms cost hundreds more.) Eibeck had correctly noted the presence of Jessica's pictures and graduation collage—items that carry inherent personal value. But Eibeck had not halted the trash-out and consulted with Freddie Mac, as the procedures required.

Freddie Mac and the Beauchamps filed cross motions for summary judgment. The district court denied the Beauchamps' motion and granted summary judgment in favor of Freddie

Mac instead. The district court then concluded that it no longer had supplemental jurisdiction over the Beauchamps' claims against Eibeck. This appeal followed.

II.

A.

"We review a district court's grant of summary judgment de novo." *Mendel v. City of Gibraltar*, 727 F.3d 565, 568 (6th Cir. 2013). The movant is entitled to summary judgment if he shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making this determination "[w]e view the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Mendel*, 727 F.3d at 568.

1.

The Beauchamps first challenge the district court's conclusion that Freddie Mac is not vicariously liable for Eibeck's destruction of the Beauchamps' property. The parties agree that Kentucky law governs this issue. A company "may be held vicariously liable for the negligent acts of [its] agent, but generally is not held liable for the conduct of an independent contractor." *Nazar v. Branham*, 291 S.W.3d 599, 606 (Ky. 2009). The Beauchamps argue that the district court erred when it determined that Eibeck was not Freddie Mac's agent and that Freddie Mac was therefore not vicariously liable for the trash-out.

An agency relationship "results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control[.]" *Phelps v. Louisville Water Co.*, 103 S.W.3d 46, 50 (Ky. 2003). Here, the contract itself provides that, "[w]ith respect to each Listing, [Eibeck] shall act as agent, but not as attorney-in-fact, for [Freddie Mac]." R. 99-6 at 3. The district court found that use of "agent" ambiguous because the "term is

common parlance in the real estate business[.]" Op. at 13. But the sentence designating Eibeck as Freddie Mac's agent immediately follows the heading, "**AGENCY RELATIONSHIP**." R. 99-6 at 3. For his part, Eibeck understood the contract to mean that he was "acting as an agent of Freddie Mac" when he emptied the garage. R. 99-9 at 1.

How the parties characterize the relationship, however, does not determine whether Eibeck was an agent under Kentucky law. For example, even where a contract expressly designates a person as an independent contractor, a court might find an agency relationship. *CSX Transp. Inc. v. First Nat'l Bank of Grayson*, 14 S.W.3d 563, 566-67 (Ky. Ct. App. 1999); *see also Kentucky Unemployment Ins. Comm'n v. Landmark Cmty. Newspapers of Kentucky, Inc.*, 91 S.W.3d 575 (Ky. 2002). "The right to control is considered the most critical element in determining whether an agency relationship exists." *Nazar*, 291 S.W.3d at 609. Specifically, a person is an agent when "the principal has the power or responsibility to control the method, manner, and details of the agent's work." *Id.* at 606-07. But a person is an independent contractor if she "is free to determine how work is done and the principal cares only about the end result[.]" *Id.* at 607.

Here, the record—read most favorably to the Beauchamps—shows that Freddie Mac directed the "method, manner, and details" of Eibeck's work in numerous ways. The contract itself imposed on Eibeck specific requirements ranging from the type of office space Eibeck had to maintain to the timelines for actions like preparing properties for winter. R. 99-6 at 2, 7. The contract required Eibeck to check regularly the email address provided by Freddie Mac so he could respond to further instructions.

The contract also required Eibeck to comply with procedures listed in three additional documents incorporated by reference into the contract—the Supplier Code of Conduct, R. 99-7

at 12-21, the QuickSteps for Brokers Guide, R. 95-5, and the Broker/Vender Training Guide, R. 95-4. *See* R. 99-6 at 1, 6 (contract). And Freddie Mac required Eibeck to complete quarterly training programs to review these procedures and to learn any new procedures. Both the Brokers Guide and the Training Guide—in addition to the contract itself—address, for example, how brokers should conduct trash-outs. Those documents—totaling more than 150 pages—and the requirement to complete training four times a year or face mandatory probation, further demonstrate Freddie Mac's "power . . . to control the method, manner, and details of [Eibeck's] work[.]" *Nazar*, 291 S.W.3d at 606-07.

Freddie Mac responds that, for a number of reasons, it lacked sufficient control over Eibeck. First, Freddie Mac asserts that its "only control" over Eibeck was to evaluate his end "results" rather than the manner in which he achieved them. Freddie Mac Br. at 19. Specifically, Freddie Mac insists that it "provided no instructions to Eibeck . . . on how to perform the trash-out." Freddie Mac Br. at 16-17. But Freddie Mac gave Eibeck clear, specific instructions on how to perform trash-outs, ranging from the steps to document and inventory the abandoned possessions to the type of possessions that should trigger a halt. *See* R. 99-6 at 6; R. 95-4 at 6-7; R. 95-5 at 3-4.

Freddie Mac next asserts that it "does not require any pre-approval process before its brokers decide whether to trash-out a property or seek a court order to remove the property." Freddie Mac Br. at 5. But Freddie Mac actually requires a pre-approval process in two distinct circumstances. When, as here, the "[p]ersonal property has intrinsic value[,]" that "property <u>may not</u> be removed" until the broker (here, Eibeck) "notifies [the] eviction coordinator" (presumably a Freddie Mac employee) that the property includes "items with intrinsic value." R. 95-4 at 6. Once the eviction proceedings are complete, the broker may resume the trash-out. *Id.* at 6-7.

And when a broker is "uncertain" as to whether the value of personal property exceeds $300, the broker must "contact the eviction coordinator for further instructions before proceeding with the trash out." R. 95-5 at 3.

Freddie Mac also asserts that it "never condoned Eibeck's behavior in trashing out the wrong garage." Freddie Mac Br. at 7. But Freddie Mac's investigator concluded that Eibeck "Followed HomeSteps guid[e.]" R. 95-3 at 1.

Next, Freddie Mac contends that "the desire to promote standards[] and measure compliance with those standards" does not constitute actual day-to-day control of how Eibeck performed his work. Freddie Mac Br. at 16. The district court agreed, explaining that an independent contractor does not become an agent "merely because the contract stipulates that the work must adhere to certain policies, standards, or instructions from the employer." Op. at 16 (quoting 41 Am. Jur. 2d Independent Contractors § 11 (2015)). But "the retention of the right not only to insure conformity with specifications, but also . . . to direct the manner in or means by which the work shall be performed, will destroy the independent status of [a] contractor." 41 Am. Jur. 2d Independent Contractors § 10 (2015). "The factor that largely determines whether there is the relationship of master and servant or of independent contractor is the right to control." *Decker v. Glasscock Trucking Serv., Inc.*, 397 S.W.2d 773, 775 (Ky. 1965). Thus, "[i]t is immaterial . . . whether the master did in fact control. The question is [whether] the master [had] a right to control[.]" *Id.*

Here, Freddie Mac's contract, in more than a dozen places, requires Eibeck to follow future instructions from Freddie Mac as they pertain to numerous aspects of Eibeck's day-to-day responsibilities. In one particularly relevant example, the contract requires Eibeck, if he

becomes "uncertain as to the value of property, [to] contact the Eviction Coordinator for further instructions before proceeding with [a] trash out." R. 99-6 at 6.

Finally, Freddie Mac contends that the 110-page Broker/Vender Training Guide merely "document[ed] its expectations[,]" but that "it was up to Eibeck to determine how . . . and if to implement those procedures." Freddie Mac Br. at 18-19. Thus, because "Eibeck still had the independent authority to choose whether" and "how" "to follow those guidelines[,]" Freddie Mac Br. at 19, Eibeck was able "to maintain a level of professional independence that negates a master/servant relationship[,]" Freddie Mac Br. at 18. But Freddie Mac admits elsewhere in its brief that the contract "required Eibeck to perform certain duties" and "follow [certain] standards[.]" Freddie Mac Br. at 16. Moreover, the contract itself required Eibeck to "perform[] the Brokerage and management duties in accordance with the Supplier Code of Conduct and the Broker/Vender Training guide[,]" and to "adher[e] to . . . the QuickSteps for Broker[s] Guide." R. 99-6 at 1, 6. And the QuickSteps for Brokers Guide warned that "[f]ailure to adhere to this standard will be considered a performance issue." R. 95-5 at 4.

These are not the hallmarks of an employer who "cares only about the end result[.]" *Nazar*, 291 S.W.3d at 607. Rather, a reasonable jury could conclude on this record that Freddie Mac had the "power . . . to control the method, manner, and details of [Eibeck's] work[.]" *Id.* The district court was mistaken in holding otherwise.

2.

The Beauchamps next challenge the district court's grant of summary judgment on their claim that Freddie Mac negligently supervised Eibeck. Specifically, the Beauchamps claim that Freddie Mac negligently supervised Eibeck by failing to train him and by giving him inadequate directions to the correct garage. But Freddie Mac did train Eibeck and gave him the correct

address to the foreclosed property. Eibeck's failure to perform—not Freddie Mac's failure to instruct—caused the harm here. Thus, although Freddie Mac is vicariously liable for Eibeck's mistakes, it is not directly liable for the harm he caused.

B.

There remains one issue we raise on our own motion. Many of the documents at the nub of this dispute—including the contract itself and the documents it incorporates by reference—were filed in the court record under seal and are thus unavailable to the public. We review the sealing of court records for an abuse of discretion—"although, in light of the important rights involved, the district court's decision is not accorded the deference that standard normally brings." *Shane Grp., Inc. v. Blue Cross Blue Shield of Michigan*, Nos. 15-1544, 1551, 1552, 2016 WL 3163073, at \*4 (6th Cir. June 7, 2016) (internal quotation marks omitted).

During discovery, courts often issue blanket protective orders that empower the parties themselves to designate which documents contain confidential information. Once the parties place a document in the record, however, "very different considerations apply." *Id.* at \*3. The proponent of sealing must provide compelling reasons to seal the documents and demonstrate that the sealing is narrowly tailored to those reasons—specifically, by "analyz[ing] in detail, document by document, the propriety of secrecy, providing reasons and legal citations." *Id.* Even where, as here, neither party objects to the propriety of sealing a court record, the district court has an independent duty to "set forth specific findings and conclusions which justify nondisclosure to the public." *Id.* at \*4 (internal quotation marks omitted). A court's failure to set forth those findings and conclusions "is itself grounds to vacate an order to seal." *Id.*

Here, the district court made no findings at all. Early in the discovery process, the parties proposed a stipulated protective order allowing them to designate which documents contained

confidential information under Federal Rule of Civil Procedure 26(c). R. 72. The proposed order further provided that any confidential document they later filed in the court record must be filed under seal:

> If confidential materials are to be used at trial or other judicial proceeding, the materials shall be treated as confidential. Unless counsel for all parties agree otherwise, or until an Order of this Court otherwise directs, all CONFIDENTIAL material . . . which are presented to the Court shall be sealed, and marked with the legend "CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER; NOT TO BE OPENED EXCEPT BY COURT AUTHORITY OR BY AGREEMENT OF ALL COUNSEL," and filed with the Clerk of the Court. The parties may agree to an alternative procedure for handling confidential materials at trial or other judicial proceeding.

R. 72 at 5-6. When the parties filed their motions for summary judgment, they filed them under seal, along with hundreds of sealed exhibit pages. R. 97; R. 99. The parties offered no compelling reasons to seal these court records, nor did they assert that the seal would be narrowly tailored. The parties filed no motion requesting a seal nor did the district court enter an order approving the seal—much less setting forth specific findings and conclusions that justify withholding the documents from the public. Instead, there appears in the record a note from the Clerk: "Call from counsel requesting that motion be filed under seal. Motion sealed per Protective Order 72." The record before us therefore does not justify a seal.

\*      \*      \*

The district court's judgment is reversed in part, the orders to seal documents are vacated, and the case remanded for further proceedings consistent with this opinion.