NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0078n.06

No. 24-5543

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED

Feb 09, 2026

KELLY L. STEPHENS, Clerk

DREXEL CHEMICAL COMPANY,

    Plaintiff-Appellant,

v.

GOWAN COMPANY, LLC,

    Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE

OPINION

Before: CLAY, KETHLEDGE, and LARSEN, Circuit Judges.

KETHLEDGE, Circuit Judge. Two pesticide companies dispute the effective termination date of their "Cooperation Agreement" to sell an herbicide. Drexel Chemical Company argues that the agreement terminated on December 31, 2023; Gowan Company says it ended on April 29 of that year. The district court adopted Gowan's interpretation of the agreement's termination clause. We respectfully disagree and reverse.

I.

Drexel is a Tennessee corporation, Gowan an Arizona one; both of them manufacture and sell pesticides used in the agricultural business. One such pesticide—actually an herbicide, which are a subset of pesticides—is S-Ethyl dipropylthiocarbamate, known as "EPTC." By way of background, before a pesticide can be marketed in the United States, it must be "registered" with the EPA. 7 U.S.C. § 136a(a). As part of the registration process, the company that first seeks to market a pesticide (which usually holds a patent for it as well) must submit to the EPA what is

known as "registration data." That data includes, among many other things, the pesticide's "complete [chemical] formula," along with data showing that the pesticide's use is reasonably safe for humans and for the environment. *See id*. § 136a(c). Registration data is itself valuable intellectual property: a company that seeks to market a generic version of a pesticide, after its patent expires, must register that version with the EPA; in doing so, the new registrant typically relies on the original registrant's data (as to safety, and so on) for the pesticide; and the new registrant must then compensate the owner of that data for that use. *See* § 136a(c)(7)(A) and (B).

By 2006, Gowan had purchased the "EPTC business" of a much larger pesticide company, Syngenta Group, which had moved on to selling a newer, patented herbicide. (By then EPTC had been sold in the United States for more than a half-century.) Gowan's "EPTC business" included registrations for generic EPTC products, as well as ownership of the underlying "EPTC registration data." EPTC is used to protect certain crops—potatoes, above all, but also beans, corn, and alfalfa, among others. Tr. 106, 145-46. It does so by killing the seeds of destructive weeds (selectively, without harming the crop) as they germinate; if applied thereafter, apparently, EPTC is ineffective. Tr. 105-06.

Thus, for most crops, EPTC must be applied early in the year—typically, between February and May, depending on latitude. Tr. 104, 107. Hence the market for EPTC is seasonal: as Gowan executive Juli Jessen explained, producers "start filling the tanks" with new product in the fall, when distributors (who sell the product to farmers) "make these decisions" about which products to offer to farmers (what Jessen called "the distributor mentality"). Tr. 150-51. Once the tanks are full, Jessen testified, "we bill out the product" to distributors, "usually with some sales terms . . . so that they will be prepared to start applying the product when they can get into those fields." Tr. 150. Relatedly, Drexel executive Stanley Bernard observed: "You can easily miss a whole

calendar year by not having your product ready to distribute and make it to the farmer in time for his growing season." Tr. 104. A producer's invoices for EPTC typically remain outstanding during the growing season. Tr. 111. But by the fall, Jessen explained, producers will "close them out and pay rebates" to distributors, thereby settling their accounts for the year. Tr. 151.

Meanwhile, again in 2006, Drexel was seeking to enter the generic EPTC market. Drexel had obtained its own EPTC registrations from the EPA, using the registration data then owned by Gowan; and the two companies were then engaged in arbitration as to the compensation owed by Drexel to Gowan for that use. Rather than fight through an arbitration and then compete against each other in the same market, however, Drexel and Gowan decided to join forces. In July 2006 they entered into a "Cooperation Agreement," whose minimum term was 15 years, and whose effective date was January 1, 2006. The agreement provided that Gowan would dismiss its "data compensation claim against Drexel"; that "Drexel shall withdraw its EPTC products from the market"; and that "both Parties acknowledge equal (50/50) ownership of all EPTC Assets." Agmt. §§ 2, 4. The agreement further provided (to simplify somewhat) that Gowan would perform all the functions necessary actually to produce and sell the EPTC to distributors—e.g., "manage supply and delivery activities," "contract with third party formulators," and "perform all marketing, sales and distribution of the Products[.]" Agmt. § 7.1, Ex. A.

The agreement also included a profit-sharing provision, in § 8. That provision defined "net profits" as the "net selling price" of the EPTC goods sold in a particular "Fiscal Year," minus (a) the "actual cost" of producing and storing the goods (e.g., "raw materials," "manufacturing," "formulation, packaging, storage," and so on), and (b) a 22% "Service Fee," payable to Gowan, for performing all the activities (recited above) necessary for manufacturing and marketing the EPTC products. "Fiscal Year" was defined as "the period beginning on September 1 of any year

and ending on August 31 of the following year." That timing tracked the seasonal cycle of producing EPTC in the fall, selling it to distributors before planting, and then closing out accounts with them before the next fall. Agmt. § 1.4. Meanwhile, Gowan was running the actual business, and thus paying production costs and receiving payments from distributors. Thus, § 8.2 provided that "Gowan shall pay directly to Drexel its share of the net profits," in "one annual payment within thirty (30) days of the end of the Fiscal Year and only on the sales that are final, which in this case shall mean sales for which no invoices are outstanding and all rebates have been paid."

Section 8.1 further provided that the "net profits" of the companies' EPTC business (as well as the "net losses," of which there were none) would be allocated as follows:

| Calendar Year | Gowan | Drexel |
|---|---|---|
| 2006 through and including 2010 | 75% | 25% |
| 2011 through and including 2015 | 60% | 40% |
| 2016 and thereafter | 50% | 50% |

The effect of that allocation of net profits—favoring Gowan in the agreement's first ten years, leveling off to 50/50 thereafter—was to compensate Gowan for granting Drexel equal ownership of the EPTC registration data. Tr. 23. Thus, as a practical matter, the Cooperation Agreement was a noncompete agreement: rather than enter the EPTC market, Drexel agreed to stay out of it, in exchange for half-ownership of Gowan's registration data and a cut of the profits of an EPTC business that, by all appearances, Gowan carried on largely as it had before.

Finally, as relevant here, the agreement included a termination clause. Section 6.1 provides:

> This Agreement shall remain in full force and effect until the fifteenth anniversary of the Effective Date. Thereafter the Agreement shall extend automatically in one year increments unless terminated by either Party with two (2) years' prior written notice, with the earliest termination notification being January 1, 2021.

On April 29, 2021, Gowan notified Drexel of its intent to terminate the agreement. Gowan's termination letter recited an aim of "completing the termination by December 31, 2022." But Gowan later changed course, and said the agreement would end on April 29, 2023—two years after the notice date. Drexel read § 6.1 differently, to renew the agreement in "one year increments" rather than partial ones—so that the agreement would not end until December 31, 2023.

Drexel eventually brought this suit in federal court, seeking a declaratory judgment that Drexel's reading of § 6.1 is correct. (Gowan and Drexel are citizens of different states, so the district court had diversity jurisdiction.) After a brief bench trial, during which a total of two witnesses testified—Bernard for Drexel, Jessen for Gowan—the district court ruled from the bench that Gowan's reading of § 6.1 was correct. The court also denied a motion by Drexel for a new trial or to alter or amend the judgment under Federal Rule of Procedure 59, and a motion to seal the trial record. This appeal followed.

II.

We review the district court's legal conclusions de novo and its factual findings for clear error. *Pressman v. Franklin Nat. Bank*, 384 F.3d 182, 185 (6th Cir. 2004). Per the parties' agreement, Tennessee law applies here. Agmt. § 15.

This case illustrates how the relevant context for interpreting contracts and statutes, respectively, is sometimes different. Statutes bind everyone in the jurisdiction where they apply, so we interpret them according to their public meaning—which, in most cases, is the meaning of the statute's text as its words are ordinarily understood. *See Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 277-78 (2018). Tennessee courts likewise interpret a contract's terms "as those terms are ordinarily understood." *Pharma Conf. Edu., Inc. v. State*, 703 S.W.3d 305, 311 (Tenn. 2024).

But contracts bind only the parties that agree to them. Thus, the Tennessee Supreme Court has said, a "cardinal rule of contract interpretation is to ascertain and give effect to the intent of the parties." *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006).

Frequently a contractual term, considered within the contract's four corners, can be read only one way. In the agreement here, for example, § 8.2 provides that Gowan "shall pay" Drexel "its share of the net profits" for a fiscal year in "one annual payment"—which excludes any argument that Gowan could break that payment in two. But sometimes "contractual language" is "susceptible to more than one reasonable interpretation." *Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tenn., Inc.*, 566 S.W.3d 671, 691 & n.18 (Tenn. 2019). (That circumstance is what the Tennessee courts call a "threshold ambiguity[,]" *id.*, which is not ambiguity in the usual sense of equipoise.) In that circumstance, the court may consider—as relevant context—"evidence related to the situation of the parties and the circumstances of the transaction[,]" along with "the subject matter of the contract." *Pharma Conf.*, 703 S.W.3d at 316 (cleaned up); *see also Individual Healthcare Specialists*, 566 S.W.3d at 692. That kind of evidence concerns "objective" circumstances, rather than "a party's subjective understanding of the contract's terms." *Pharma Conf.*, 703 S.W.3d at 317. Thus—to determine which of two meanings for a contractual term is the correct one—a court may consider those objective circumstances.

Such is the case here. Section 6.1, to reiterate, says that—after the 15th anniversary of the agreement's January 1, 2006 effective date—"the Agreement shall extend automatically in one year increments unless terminated by either Party with two (2) years' prior written notice, with the earliest termination notification being January 1, 2021." The question here is whether—when a party gives such notice on April 29, rather than on January 1—the agreement terminates exactly two years after the party gave notice, or whether instead the agreement extends beyond that date,

to the end of that calendar year. Gowan argues, and the district court agreed, that "two (2) years' prior written notice" means simply that—and thus that the agreement ended on April 29, 2023, which was two years after Gowan gave notice of its intent to terminate. Drexel counters that, beginning "on the fifteenth Anniversary of the Effective Date"—which, in fact, is the relevant anniversary here—the agreement shall "extend automatically in one year increments" unless the agreement has been "terminated" with two years' "prior written notice"; and that, on January 1, 2023, the agreement had not so "terminated," because Gowan had given notice only 20 months before. Thus, Drexel argues, the agreement terminated on December 31, 2023—because only then would the agreement have been prevented from extending "automatically" in a "one year increment[]."

When one considers only the text of § 6.1, both of these meanings are linguistically plausible. To discern which meaning better aligns with the parties' likely intent, therefore, we look first to other provisions in the agreement itself. Those tend to support Drexel's interpretation. As noted above, "Fiscal Year" is defined as "the period beginning on September 1 of any year and ending on August 31 of the following year." Agmt. § 1.4. Of course, one might argue those dates are arbitrary; but the agreement's profit-sharing provisions suggest they are not. Those provisions require a determination of "net profits" each year; and net profits equals revenue minus costs (including Gowan's service fee). Agmt. § 8.2. Thus, one must know the totals for costs and revenues alike before one can determine "net profits" for a "Fiscal Year." And § 8.2 requires Gowan to make that determination at "the end of a Fiscal Year," not in the middle of it, and to pay Drexel its share of net profits in a single "annual payment" not more than 30 days later. One might infer, therefore, that the parties might not receive some of their revenues until the end of the fiscal year.

Yet that leaves the question whether costs and revenues for EPTC are distributed more or less evenly throughout the fiscal year—as, say, the costs and revenues (and thus profits) of selling pens or paper towels might be. For in that case, termination of the agreement in the middle of a fiscal year—and thus conducting a net-profit determination then—might be fair to both parties: the fraction of net profits paid to Drexel would approximate the fraction of the fiscal year that had passed. But if the costs and revenues for EPTC are skewed, respectively, toward one end of the fiscal year or another—for example, if costs are frontloaded during the fiscal year, and revenues backloaded—then a net-profits determination in the middle of a fiscal year could likewise be skewed in favor of one party or the other. And that, in turn, would suggest that the parties intended that the agreement would renew in "one year increments," or not at all.

So, to determine which of these possible interpretations of § 6.1 is correct, we consider "the situation of the parties and the circumstances of the transaction." *Pharma Conf.*, 703 S.W.2d at 316 (cleaned up). Those circumstances were the subject of the two executives' testimony at trial; and for the most part those circumstances are undisputed. Specifically, as described above, the costs of producing and marketing were indeed frontloaded in the fiscal year: the EPTC "tanks" were filled in the fall; and Gowan then published its "sales terms" to distributors, who promptly made their purchasing decisions so that (as Jessen testified) farmers "will be prepared to start applying the product when they can get into those fields." Tr. 150. Invoices are paid later, Tr. 111, with most sales being "final" by the end of the fiscal year (August 31), when net profits are calculated. Agmt. § 8.2. The whole process, and with it a new fiscal year, then begins anew on September 1.

Nobody disputed any of these points at trial. True, Jessen testified that some crops—carrots and alfalfa, for example—were sometimes planted later in the calendar year. But the record makes clear that those crops were marginal for purposes of generating EPTC sales. Indeed, Jessen admitted that two of "the three main crops" for EPTC—"potatoes and dry beans"—followed the seasonal schedule of winter sales and spring planting, as described above. Tr. 149-50. "And so the market season," Jessen said, was to release "sales programs in the fall[,]" and then to "close them out and pay rebates the following fall." Tr. 151.

Thus, as described by the executives for both parties, the EPTC market is indeed seasonal. The agreement's "Fiscal Year" tracks that seasonal schedule just as Jessen described it—which by all appearances is why the net-profit determination comes after that date, and not before. The undisputed "circumstances of the transaction" here, therefore, show that a determination of net profits in April, rather than September, would understate profits for the fiscal year—to Drexel's serious detriment. That conclusion too is supported by the record: according to Bernard, Drexel's share of net profits fluctuated between $600,000 and $800,000 per fiscal year, Tr. 123; yet Drexel's share of profits for the first seven months of fiscal year 2023—after the district court held the agreement had terminated on April 29 of that year—was less than $2,900. Appellee Br. 19.

The district court, for its part, reasoned that "Section 6.1 does not contain the words December 31st," and thus that Drexel's interpretation added "terms or language to the contract." Tr. 7-8. But one could just as easily say that Gowan's interpretation elides the words, "extend automatically in one year increments," as used in § 6.1. The court also reasoned that the April 29, 2023, termination—some 20 months after Gowan gave notice—afforded Drexel plenty of "time to prepare for life after the contract ends." Tr. 9. But Drexel's point, as to the parties' circumstances, was not that Drexel lacked time for an orderly transition away from the Cooperation

Agreement. Drexel's point, rather, was that a mid-year termination would allow Gowan to retain nearly 100% of the parties' net profits from EPTC for that year—which is in fact what happened. Moreover, the April 29 termination meant that Drexel could not participate in the EPTC market in any capacity—as a co-venturer with Gowan, or as a competitor in its own right—during the 2023 fiscal year. As Bernard explained: "April 29th is too late for us to enter the market. Yet, it's not going to be late enough for us to share in the profits." Tr. 111.

The district court otherwise reasoned that "Ms. Jessen's testimony on market timing for the distributors and the various growing seasons" for various crops was "more specific and clearer, and, thus, more persuasive," than Bernard's testimony was. Tr. 8. But the court overlooked that Jessen's testimony on those points complemented Bernard's testimony rather than conflicted with it. Indeed, this was a trial in which few if any facts were actually disputed. Drexel's interpretation of § 6.1 comports with the Agreement's other provisions and with the circumstances surrounding the parties' agreement; Gowan's interpretation is one to which no rational actor in Drexel's position would agree. Finally, in construing § 6.1 the district court did not assign any significance, so far as the record shows, to the seasonal nature of costs and revenues in the EPTC business. And that circumstance, for all the reasons explained above, is pivotal in determining the parties' intent in this agreement. We therefore conclude that Drexel's interpretation of § 6.1 is correct, and that the parties' agreement therefore terminated on December 31, 2023, rather than on April 29 of that year.

Separately, we agree with the district court that Drexel did not remotely make the showing necessary to seal the trial record. *See Shane Grp., Inc. v. Blue Cross Blue Shield of Mich.*, 825 F.3d 299, 305–06 (6th Cir. 2016).

\*　　\*　　\*

The district court's judgment is reversed, and the case is remanded for proceedings consistent with this opinion. The district court's April 30, 2024, order denying Drexel's motion to seal is affirmed.